IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

DR. MARY MOTON, GOLDEN SHARPE,       PLAINTIFFS
DR. JIMMY WILEY, MAPLE MELTON
and DONALD CLARK

VS.          CIVIL ACTION NO. 4:15cv049-DMB-JMV

CLARKSDALE, MISSISSIPPI         DEFENDANT

COMPLAINT

## I. Introduction

1. This is a suit in equity under Section 2 of the Voting Rights Act of 1965, 42 U.S.C.A. Section 1973, 42 U.S.C. Section 1983, the equal protection clause of the Fourteenth Amendment and the "on account of race or color" provisions of the Fifteenth Amendment of the United States Constitution for declaratory and injunctive relief against further use of the Clarksdale, Mississippi Board of Commissioners (CMBOC) four (4) ward plan based on 2010 census data and adopted on August 13, 2012 and precleared by the United States Attorney General (USAG) under Section 5 on November 8, 2012.

2. The totality of the facts and circumstances demonstrates that race predominated in the design, configuration and adoption of the August 13, 2012 CMBOC four (4) ward plan and minimizes, cancels out and dilutes African American voting strength and results in a denial of an equal opportunity for African American voters to participate in the political processes and to elect board of

1

commissioner candidates of their choice in violation of Section 2 of the Voting Rights Act of 1965, as amended, the equal protection clause of the Fourteenth Amendment and the "on account of race or color provisions" of the Fifteenth Amendment to the United States Constitution.

## II.  Jurisdiction

3.  This Court has jurisdiction over this action pursuant to 42 U.S.C. Section 1973 and 28 U.S.C. Sections 1331, 1343, 1344, 2201 and 2202.

## III. Parties

4.  Plaintiffs are African American registered voters and citizens of Clarksdale, Mississippi(CM).

5. CM is a special charter municipality, but operates under the commission form of government pursuant to Miss. Code Ann. Section 21-5-1 et. seq. Pursuant to Miss. R. Civ. P. 4(d)(7), the defendant maybe served with process of this Court by and through its City Clerk, Cathy Clark, 121 Sunflower Avenue, Clarksdale, Mississippi.

6. CM is sued for injunctive and declaratory relief.

7. At all relevant times set out herein, defendant, by and through its officials acted under the color of the statutes, ordinances, regulations, customs, and usages of the State of Mississippi and CM.

## IV. Facts

8. According to the 2010 Census, Clarksdale has a total population of 17,962 with a single-race Black[1] population of 14,184 (78.97%) and an Any Part (AP) Black[2] population of 14,256 (79.37%). The 2010 White population is 3,496 (19.46%).

9. In CM, African Americans constitute a smaller percentage of the voting-age population than the total population, while the reverse is true for Whites. According to the 2010 Census, CM has a total voting-age population of 12,469, of whom 9,344 (74.94%) are single-race Black, with an AP Black voting-age population (BVAP) of 9,389 (75.30%). The White voting-age population in CM is 2,934 (23.53%).

10. The table in Figure 2 shows the population of CM County by race and ethnicity for the decennial censuses between 1980 and 2010.

Figure 2

Clarksdale – 1980 Census to 2010 Census
Population and Race Distribution

---

[1] The terms "Black" or "African American" are used synonymously and include single-race Black Hispanics, unless otherwise noted. "White" refers to single race non-Hispanic White.

[2] The Any Part Black classification counts as "Black" all persons who identified in the 2010 Census as single-race Black or more than one race and some part Black. The AP Black category includes persons who are some part Black and Hispanic. It is my understanding that following the 2005 *Georgia v. Ashcroft* U.S. Supreme Court decision, the "any part" definition is an appropriate Census classification to use in most Section 2 cases. Given the small number of people in CM who are multi race and some part Black, in this declaration — for simplicity and purposes of comparison — "Black" or "African American" refers to single-race persons, unless otherwise noted.

|  | 1980 |  | 1990 |  | 2000 |  | 2010 |  |
|---|---|---|---|---|---|---|---|---|
| Total Population | 21,137 | 100% | 19,717 | 100% | 20,645 | 100% | 17,962 | 100% |
| Total Hispanics | 178 | 0.84% | 63 | 1.02% | 134 | 0.65% | 168 | 0.94% |
| White* | 7,984 | 37.77% | 7,406 | 37.56% | 6,184 | 29.95% | 3,496 | 19.46% |
| Black* | 13,022 | 61.61% | 12,195 | 61.85% | 14,146 | 68.52% | 14,184 | 78.97% |
| Other* |  |  |  |  |  |  |  |  |
| Any Part Black* | NA | NA | NA | NA | 14223 | 68.89% | 14,256 | 79.37% |

NA Not Available

* Includes Hispanics

Sources: 1980 to 2010 decennial censuses.

11. Since 1980, CM has experienced a significant population decline – from 21,137 persons in 1980 to 17,962 in 2010. This represents a loss of 3,175 persons (-15.02%). The most significant decade-over-decade population decline during the 30-year period occurred between 2000 and 2010, with the population dropping by 2,683 persons. Thus, the 2000 to 2010 decline represented 84.5% of the total loss between 1980 and 2010.

12. As shown in the chart in Figure 3, the Black population increased from 13,022 in 1980 to 14,184 in 2010 – a gain of 1,162 persons (8.92%).

Figure 3

Clarksdale – 1980 Census to 2010 Census African

American and White Population Comparison



13. Figure 3 also reveals that the White population experienced a sharp decline over the 30-year period – dropping from 7,984 in 1980 to 3,496 in 2010. This decline amounted to a loss of 4,448 persons, cutting the White population by more than half (-56.21%).

14. As the overall population declined between 1980 and 2010, the Black population percentage in Clarksdale climbed – from 64.61% in 1980 to 78.97% in 2010. By contrast, the total White population fell from 37.77% in 1980 to 19.46% in 2010.

15. CM is the county seat of Coahoma County, Mississippi, was founded in 1848 and incorporated in 1882. Pursuant to Miss. Code Ann. Section 21-5-3 (Rev. 1973), "[e]very city operating under the commission form of government shall be governed by a council

consisting of the Mayor and two (2) councilmen (or commissioners), each of whom shall have the right to vote on all questions coming before the council." From 1986 to the present date, CM has operated with four (4) commissioners, but under Miss. Code Ann. Section 21-5-3 (Rev. 1974), "[a] city having a population of one hundred thousand (100,000) inhabitants... may upon election held as hereinafter provided, increase by two (2) the number of councilmen governing such city; provided that in no event shall the number of councilmen (not including the Mayor) be increased to exceed ten (10) members. There are legal issues concerning CM's use of four (4) commissioners under Section 21-5-3 (Rev. 1974).

16. CM is governed by a four (4) board of commissioners elected from four (4) wards. Pursuant to the custom, practice and procedure used in CM the qualified electors of each of the four (4) wards elect one (1) member to the CMBOC at regular quadrennial elections (2009, 2013 and 2017). The elected members of the CMBOC are also responsible for the governance of the municipality. The CMBOC is responsible for the drawing of boundaries of the four (4) wards used to elect commissioners in accord with its special charter, the provisions of Miss. Code Ann. Section 21-5-1 et. seq., the one-person one-vote principle, the equal protection clause of the Fourteenth Amendment, the "on account of race and color provisions" of the Fifteenth Amendment to the United States Constitution and the Voting Rights Act of 1965, as amended.

6

17. The four (4) CMBOC wards are also used to elect four (4) of the five (5) municipal party executive committee members. Under Mississippi law, one (1) member of each municipal party executive committee members is elected at large.

18. In 1985, during the pendency of <u>Johnny Lewis, et al. vs. The City of Clarksdale, Mississippi, et al.</u>, Civil Action No. DC 84-108-WK-0 (the "Lewis litigation"), the CMBOC adopted a resolution which divided CM into four wards from which the CMBOC was to be elected, with the Mayor to be elected at large.

19. On November 20, 1985, CM submitted the CMBOC ward plan to the USAG for Section 5 preclearance under the Voting Rights Act of 1965, as amended, but there are state law legal issues concerning CM's legal authority to operate with four (4) commissioners.

20. By Section 5 preclearance letter dated March 31, 1986, the USAG notified CM and the CMBOC that he did not interpose an objection to the proposed CMBOC four (4) ward plan.

21. ·By resolution adopted on April 21, 1986, the CMBOC finally approved and adopted the 1986 ward plan which established a polling place in each ward for the conduct of CMBOC elections, described the boundaries of each ward by metes and bounds, and adopted the official ward plan, setting forth the population, voting age and racial percentages of each of the four (4) wards.

22. On April 29, 1986, the United States District Court for

the Northern District of Mississippi entered its final judgment in the <u>Lewis</u> litigation, approving the April 21, 1986 CMBOC four (4) ward plan as adopted in the April 21, 1986 CMBOC resolution, but made no legal determination based on the use of four (4) wards under 21-5-3.

23. CM and its CMBOC purported to amend Section 2 of the city charter to reflect the April 21, 1986 ward plan, but there remains state law legal issues concerning CM's compliance with Miss. Code Ann. 21-17-9 (Rev. 1988).

24. The CMBOC elections were conducted in 1986 with those persons who were then elected to serve until the first Monday of July,1989. At the 1986 special elections, John Mayo (white)was elected Mayor, and the following Commissioners were elected from the following Wards: George G. Flowers (white), Ward 1; Grady Palmer (white), Ward 2; James Hicks (African American), Ward 3; and Elijah Wilson (African American), Ward 4.

25. The regularly scheduled 1989 CMBOC elections were conducted in the spring of 1989 and the following officials were elected and took office on the first Monday of July, 1989: Henry W. Espy (African American) was elected as Mayor, and the following Commissioners were elected from the following Wards: George G. Flowers (white), Ward 1; Grady Palmer (white), Ward 2; James Hicks (African American), Ward 3; Edward Seals (African American), Ward 4.

26. On October 30, 1989, the CMBOC adopted an ordinance seeking to annex certain adjacent, unincorporated territories (the"Annexation Ordinance"). CM simultaneously filed its annexation petition in the Chancery Court of Coahoma County, Mississippi in Cause No.28,412 (the "Annexation Litigation"). Following the trial of the annexation proceedings in May, 1991, the Chancery Court entered its ruling dated November 5, 1991). On December 18, 1991, the Chancery Court entered its Final Annexation Decree (the "Annexation Decree") altering the corporate boundaries of CM and approving the annexation of the adjacent unincorporated territory as described in the Annexation Decree.

27. The annexation territories and the new CM boundaries as defined by the Chancery Court in the Annexation Decree are reflected on the official CM map, on file in the office of the CM City Clerk.

28. Following the entry of the Annexation Decree, certain objectors, including James G. Wilbourn, Jr., etc., perfected their appeal to the Mississippi Supreme Court seeking to be excluded from the newly constituted boundaries of the CM, following which, the CM filed its cross appeal, seeking to include the undeveloped acreage excluded by the Chancery Court in its November 5, 1991 ruling and in the Annexation Decree.

29. On July 15, 1992, the Mississippi Supreme Court dismissed the appeal and the cross appeal and ordered that the

Chancellor's Annexation Decree would become final on July 27, 1992, by mandate issued July 15, 1992 by the Mississippi Supreme Court in Cause No. TS92-TS-0228.

30. On Monday, October 5, 1992, the CMBOC adopted a resolution and order (the "October 5, 1992 Resolution and Order"), adopting its redistricting plan (the "1992 Redistricting Plan"), establishing geographical boundaries of each of the CMBOC wards based upon the 1992 annexation and the 1990 decennial census data, setting out the geographical boundaries of each CMBOC ward by metes and bounds, including the annexed territories incorporated as part of the 1992 Annexation, and which included, in the official ward plan, the population, voting age and racial percentages of each ward, including the residents of the annexation territories added by the Annexation Decree in the October 5, 1992 Resolution and Order, subject, however, to preclearance by the USAG under the Voting Rights Act of 1965, as amended.

31. On October 27, 1992, the CMBOC filed its Section 5 submission for the October 5, 1992 Resolution and Order adopted by the CMBOC adopting the 1992 ward plan under the Voting Rights Act. On December 2, 1992, the CMBOC filed supplemental information with the UASG as requested. The CMBOC submitted the Annexation and the October 5, 1992 CMBOC ward plan to the USAG pursuant to Section 5 of the Voting Rights Act.

32. On December 28, 1992, the USAG notified CM that it did

10

not interpose an objection to the specified changes as contained in the October 5, 1992 CMBOC ward plan as submitted including the Annexation.

33. The regularly scheduled CMBOC elections were conducted in May 1993 at which the following officials were elected to take office effective on the first Monday of July, 1993: Henry W. Espy (African American) was elected as Mayor; and the following Commissioners were elected from the following Wards: J. Craig Gaddy (white), Ward 1; Grady Palmer (white), Ward 2; James Hicks (African American), Ward 3; and Edward Seals (African American), Ward 4.

34. The regularly scheduled CMBOC elections were conducted in the spring of 1997 at which the following officials were elected to take office on the first Monday of July, 1997: Richard M. Webster, Jr. (white) was elected as Mayor; and the following Commissioners were elected from the following Wards: J. Craig Gaddy (white), Ward 1; Grady Palmer (white), Ward 2; James Hicks (African American, Ward 3; and Edward Seals (African American), Ward 4.

35. At its regular Monday, January 22, 2001 meeting, the CMBOC acknowledged the necessity of the review of the 2000 decennial census data and its release on or about April 1, 2001 authorized the employment of Dr. Max Williams, Director of the Mississippi Center for Population Studies, to assist CM with its review of the 2000 decennial census data when released, and made certain findings relative to the scheduled 2001 municipal elections as are set forth

11

therein, all of which actions are included in the official minutes of the CMBOC for such meeting on file in the CM Clerk's office.

36. On or about April 23, 2001, litigation was filed against CM in the United States District Court for the Northern District of Mississippi, Delta Division, styled Elijah Wilson v. the City of Clarksdale, Mississippi, etc., Civil Action No. 2:01cv102-P-B (the "Wilson litigation"), seeking to enjoin the 2001 regularly scheduled municipal elections and seeking other relief as is set forth therein.

37. The United States District Court for the Northern District of Mississippi declined to enjoin the CM elections. At the elections held in May 2001, the following officials were elected, who took office effective on the first Monday of July, 2001: Henry W. Espy (African American) was elected as Mayor, and the following Commissioners were elected from the following Wards: J. Craig Gaddy (white), Ward 1; Grady Palmer (white), Ward 2; Buster Moton (African American), Ward 3; and Edward Seals (African American), Ward 4.

38. On December 10, 2001, the CMBOC adopted a resolution and order adopting a four (4) ward plan establishing geographical boundaries of each of the wards based upon the 2000 decennial census data, setting out the geographical boundaries of each ward by metes and bounds, and which included, in the official ward plan, the population, voting age and racial percentages of each ward, in

the December 10, 2001 Resolution and Order; subject, however, to preclearance by the USAG under the Voting Rights Act of 1965, as amended.

39. On September 16, 2002, the CMBOC filed with the USAG its Section 5 submission of the December 10, 2001 four (4) ward plan adopted by the CMBOC for preclearance under the Voting Rights Act.

40. On November 18, 2002, the USAG notified the CMBOC that it did not interpose an objection to the specified changes as contained in the December 10, 2001 ward plan as submitted.

41. By order dated January 20, 2004, the United States District Court for the Northern District of Mississippi denied the plaintiff's request to hold a special election under the December 10, 2001 redistricting Plan and dismissed the <u>Wilson</u> litigation.

42. The regularly scheduled CMBOC elections were conducted in May 2005, at which the following officials were elected to take office effective on the first Monday of July, 2005: Henry W. Espy (African American) was elected as Mayor; and the following Commissioners were elected from the following Wards: Budd Phelps (white), Ward 1; Grady Palmer (white), Ward 2; Buster Moton (African American), Ward 3; and Edward Seals (African American), Ward 4.

43. The regularly scheduled Mayor and CMBOC elections were conducted in May 2009, at which the following officials were elected to take office on the first Monday of July, 2009: Henry

13

Espy (African American) was elected as Mayor; and the following CMBOC were elected from the following Wards: Bo Plunk (white), Ward 1; Grady Palmer (white), Ward 2; Buster Moton (African American), Ward 3; and Edward Seals (African American), Ward 4.

44. The CMBOC four (4) ward plan was subject to redistricting following the release of the 2010 decennial census data as the same pertains to the CM and the CMBOC in order to comply with applicable state and federal laws.

45. On November 14, 2011, the CMBOC employed Slaughter & Associates to evaluate the census data and assist in the preparation of a new CMBOC redistricting plan as may be necessary so that the four wards previously created would comply with the "one-person, one-vote" principle under the Constitution of the United States Constitution, Voting Rights Act and the regulations promulgated in 28 CFR Sections 51.1 et seq.

46. On March 26, 2012, Meg Crockett of Slaughter & Associates appeared before the CMBOC and presented a report detailing the population shifts, racial composition changes for each ward and advised the CMBOC that a total deviation of 43.9% existed and required the CMBOC to redistrict. Based upon the recommendation of Meg Crockett, the CMBOC set a public hearing for April 9, 2012 to engage the public in the redistricting process.

47. On April 9, 2012, the CMBOC conducted a public hearing on the redistricting process. Notice of the meeting was published

14

in the Clarksdale Press Register two times prior to the hearing. Members of the public appeared and the CM City Attorney and Meg Crockett explained the purpose of the process to the CMBOC and to the public. At the conclusion of the hearing, the CMBOC directed the CM City Attorney and Meg Crockett to formulate a proposed redistricting plan based upon the 2010 decennial census data .

48. On May 14, 2012, at the regular meeting of the CMBOC, Meg Crockett presented the plan prepared by her and the CM City Attorney which was referred to as the "Work session 1 Plan". Work session 1 Plan showed an overall African American voting age population ("AAVAP") of 74.9% in CM and an AAVAP in ward 2 (the "Swing Ward") of 66.3% an increase of 4.9% over the 2001 Ward 2 AAVAP, and deviations within the Wards as follows: Ward 1: +4.3%; Ward 2: -4.6%; Ward 3: -2.5%; and Ward 4: +2.8%. Meg Crockett explained that the changes in the ward lines affected every ward and caused the least amount of changes to the existing wards while maintaining cohesion, and compactness along clearly defined boundaries including streets and railroad tracks. The CMBOC requested that Meg Crockett to be available to meet with the CMBOC members in a number which would not constitute a quorum on Thursday, May 17,2012 beginning at 10:00 a.m. to discuss alternative changes.

49. On May 17, 2012, Commissioners Moton and Seals met with Meg Crockett and made suggested changes to the Work session 1 Plan.

50. On May 29, 2012, Meg Crockett presented the CMBOC with suggested changes prepared by Commissioners Moton and Seals, which was referred to as the Worksession 2 Plan. The "Work session 2 Plan" had a AAVAP of 67.2% in ward 2, and deviations within the wards as follows: Ward 1: +4.3%; Ward 2: -1.0%; Ward 3: -2.3%; and Ward 4: -1.0%. Meg Crockett explained that the Work session 2 Plan caused substantially more changes to the Ward lines than the Work session 1 Plan, especially in the boundary lines of wards 2 and 3, which caused Ward 2 to cross the railroad track, which had been a boundary since the 1992 Plan, to take in approximately 6 blocks of Adams Avenue, which would be surrounded by ward 3. Meg Crockett and the CM City Attorney stated that this type of ward boundary adjustment would be suspect and looked like gerrymanding. After further discussion, the CMBOC decided to hold a public hearing on the proposed plans on July 9, 2012.

51. On June 11, 2012, at its regular Monday meeting, the CMBOC discussed the Work session 1 Plan and the Work session 2 Plan and decided to present the Work session 1 Plan at the public hearing on July 9, 2012.

52. On July 9, 2012, at its regular Monday meeting, the CMBOC conducted a hearing on the proposed plan. Notice of the hearing was published two times in the Clarksdale Press Register prior to the hearing. Mike Slaughter and Meg Crockett explained the process to the CMBOC and the public and presented the Work session

Plan. The CMBOC and the public asked questions about the plan. The CMBOC made no decision on the two plans and carried the matter forward.

53. On August 13, 2012, the CMBOC adopted Work session 1 plan as prepared by Slaughter & Associates and determined the four (4) ward plan (a) complied with the "one-person, one-vote" principle under the Constitution of the United States and the Voting Rights Act; (b) that the changes to the boundaries of the existing CMBOC wards are minimal, especially considering the 43.9% deviation resulting from the 2012 redistricting plan; (c) that the changes in the existing CMOBC wards do not have the purpose of and will not result in a denial or abridgment of any citizen's right to vote on account of race, color or language group; (d) that such changes will not lead to retrogression in the position of any racial minority with respect to its effect on the exercise of the electoral franchise; and (e) that the August 13, 2012 four (4) ward redistricting plan complies with the laws of the State of Mississippi and the prior orders of the state and federal courts, including the April 29, 1986 Final Judgment in the <u>Lewis</u> litigation.

54. The August 13, 2012 CMBOC four (4) ward redistricting plan did not require the creation of subprecincts and did not modify or affect the polling places within each ward, which shall remain unchanged under the 2012 redistricting plan.

55. One of the primary assumptions in creating the 2012 redistricting plan was to maintain the historical precedents of previous redistricting plans which evolved from various litigations surrounding the one-man, one-vote principle. In summary form, it is understood from the Lewis litigation of the late 1980s that the CM would maintain two "super-majority" African American wards (Wards 3 and 4) and one "swing ward" (Ward 2).

56. This "swing ward" was to be configured so that the AAVAP of Ward 2 would be representative of the City's overall African American voting age population. The 1986, 1992, and 2001 redistricting plans were all created and precleared based on this concept from the Lewis litigation.

57. The August 13, 2012 CMBOC plan was adopted in response to the release of the 2010 Census population counts which revealed an imbalance with the one-person, one-vote principle and necessitated redistricting. According to the 2010 census data when applied to the 2001 ward lines, ward 1 is overpopulated and needs to lose roughly 1,100 residents; ward 2 is underpopulated and needs to gain roughly 800 residents. The combined deviation of these two wards produces a total variance or deviaton of almost 44%. Ward 3 is also underpopulated by approximately 300 residents and ward 4 has an almost ideal population.

58. An analysis of the demographic composition of the wards in 1986 in the Lewis litigation to the August 13, 2012 CMBOC plan

indicates:

> (i) according to the 1980 census in CM, the TVAP was 21,137, of whom 13,022 (61.61%) were African American, 8,115(38.39%) were white and of other ethnic origins;

> (ii) according to the 1990 census in CM, the TVAP was 14,043, of whom 7,789(56.1%) were African American, 6,081(43.3%) were white and 83(0.6%) were of other ethnic origins;

> (iii) according to the 2000 census in CM, the TVAP was 13,850, of whom 8,766 (63.3%) were African American, 4,819 (34.8%) were white and 265 (1.9%) were of other ethnic origins;

> (iv) according to the 2010 census in CM, the TVAP was 12,473, of whom 9,344 (74.9%) were African American, 2,938 (23.6%) are white and 191 (1.5%) are of other ethnic origins.

59. From 1986 to 2012, AAVAP in CM increased substantially but the 2012 CMBOC redistricting plan did not increase the African American voting power, despite a significant growth in the AAVAP in CM and is powerful evidence the August 13, 2012 CMBOC four (4) ward redistricting plan was enacted with the purpose and intent of denying and abridging the African American community's right to vote.

60. The criteria used by the CMBOC to create the August 13, 2012 CMBOC redistricting plan was not followed during the redistricting process. The statements in the CM Section 5 submission of the ward plan to the USAG that "the goal of balancing the Ward 2 AAVAP percentage with the overall CM AAVAP percentage was more difficult due to significant demographic and racial

19

composition shifts in the CM," and "efforts were made to follow the criteria outlined in Appendix D and past litigations as much as possible without significantly altering ward boundaries and changing constituents." These statements are pretextual reasons not to increase the AAVAP in ward 2 to the 78.9% AATP and 74.90% level shown by the 2010 census.

61. From 1990-2012, the overall CM white total and voting age population has decreased by 15%. CM lost over 50% of the white population since the 1992 redistricting plan was adopted. The percentage of the AATP and AAVAP in CM have substantially increased; CM was represented by 61.7% African American total population(AATP) in 1992 and is now represented by 78.9% AATP according to the 2010 census, an increase of 17.2%.

62. Under the 2010 census data, ward 2 could have easily increased to over 80% AAVAP. The 2012 plan failed to account for the significant increase of the AAVAP in CM and is relevant to the Court's evaluation of whether the 2012 CMBOC plan was enacted with discriminatory purpose. A redistricting plan that does not increase African American voting power, despite a significant growth in AATP and AAVAP provides significant evidence that the plan was enacted with the purpose of denying or abridging African American's right to vote.

63. Under the provisions of Section 5 of the CM Charter, the Mayor presides over the CMBOC meetings and votes only in case of a

20

tie. Pursuant to Miss. Code Ann. Section 21-5-11 (Rev. 1974), the commissioner shall, by a majority vote, designate one member of the council to be superintendent of each department of the municipal commission, and shall define his powers and duties as such superintendent. Such designation may be changed whenever it shall commission had been elected to head the department as hereinafter provided.

64. According to the CM Section 5 submission, the city operates under a special charter which was amended following the Lewis litigation in 1986 to provide for four (4) commissioners to be elected from wards and the mayor to remain elected at-large.

65. The guidelines and procedures used by the CMBOC to develop the August 13, 2012 four (4) ward redistricting plan are:

<u>Criteria for Developing Redistricting Plan</u>

- Wards should be drawn to relatively equal populations;

- Provide for less than 10% deviation among wards;

- Wards should be contiguous;

- Boundaries should have visible lines of demarcation where possible;

- Avoid redistricting elected officials out of their district;

- Avoid, if possible, moving groups of strong constituency out of a particular district;

- Avoid, where possible, splitting Census blocks;

- Effectuate the least amount of change to

21

existing boundaries;

- Maintain racial integrity;

- Incorporate public concerns and comments; and

- Racial composition of wards shall be based on historical precedents of previous redistricting plans for the City of Clarksdale as determined by previous litigation and as approved by the Dept. of Justice.



66. According to the CM Section 5 submission, one of the primary assumptions in creating the August 13, 2012 redistricting plan "was to maintain the historical precedents of previous redistricting plans which evolved from various litigations surrounding the one-person, one-vote principle. In summary form, it was understood from the Lewis litigation of the late 1980s that CM would maintain two "super-majority" African American wards (Wards 3 and 4) and one "swing ward" (Ward 2). This "swing ward" was to be configured so that the AAVAP of Ward 2 would be representative of the CM's overall AAVAP. The 1986, 1992, and 2001 redistricting plans were all created and precleared based on this concept from the Lewis litigation." CM's actions and conduct in the design, configuration and adoption of the August 13, 2012 CMBOC ward plan indicates an unlawful racially discriminatory intent and purpose.

67. According to the 2010 census, the total population of

22

CM is 17,966, of whom 14,184 (78.9%) are African American, and 3,782 (21.1%) are white and of other ethnic origins; the total voting age population of CM is 12,473, of whom 9,344 (74.90%) are African American. The AAVAP of ward 2 is substantially less than the 78.9% AATP and 74.90% AAVAP in CM as shown by the 2010 census data.

68. Under the CMBOC four (4) ward plan adopted on August 13, 2012 and precleared under Section 5 for non-retrogression by the USAG on November 8, 2012, the TP, AATP%, the TVAP, AAVAP and AAVAP% in the four (4) wards of the CMBOC plan adopted on August 13, 2012 based on 2010 census data  are:

| Ward | TP | AATP | % | TVAP | AAVAP | % |
|------|------|--------|-------|--------|-------|--------|
| 1 | 4685 | 2734 | 58.4% | 3419 | 1769 | 51.7% |
| 2 | 4284 | 2975 | 69.4% | 3145 | 2084 | 66.3% |
| 3 | 4380 | 3982 | 90.9% | 2792 | 2480 | 88.8% |
| 4 | 4617 | 4493 | 97.3% | 3117 | 3011 | 96.6% |
| | 17,966 | 14,184 | 78.9% | 12,473 | 9,344 | 74.90% |

69. African American citizens in CM comprise 78.9% percent of the total population and 74.90% of the voting age population.  The August 13, 2012 CMBOC ward plan was designed, configured and adopted to make all four (4) wards have a majority AAVAP population, but cracks (splits/fractures) concentrated areas of African American voters in wards 1 and

23

2 and packs (overconcentrates) African American voters in wards 3 and 4 thereby diluting the overall African American voting strength in Clarksdale, Mississippi in violation of Section 2 of the Voting Rights Act of 1965, as amended, the equal protection clause of the Fourteenth and the on account of race or color provisions of the Fifteenth Amendments to the United States Constitution. Moreover, the creation of all AAVAP wards with AAVAP percentages at 51.7% and 66.3% do not offer African American voters a realistic ability to elect in CM and is a well recognized dilutionary techniques in the social science literature. The white population in CM is entitled to one (1) majority white voting age population ward.

70. The State of Mississippi and CM have a long history of official intentional and purposeful discrimination against, and the disenfranchisement of, African American voters and historically denied African American voters an equal opportunity to register, to vote an equal opportunity to elect board of commissioner members of their choice and otherwise to participate in the process to elect board of commissioners members.

71. Voting in CM has been racially polarized in wards 1 and 2 in elections involving African American commissioner candidates with white voters voting for white candidates and African American voters voting cohesively for the African

24

American CMBOC candidates, but due to present day low socioeconomic status, conditions and related factors, between 25-35 percent of African American citizens in Clarksdale, Mississippi do not register and/or turnout to vote; white registered voters in CM vote sufficiently as a bloc to enable them to usually defeat the African American citizens' preferred candidates for commissioner in wards 1 and 2 in CM. The past and present CMBOC ward plans have and continue to intentionally and purposefully fragment and crack the African American population in wards 1 and 2 and pack and over concentrate AAVAP in wards 3 and 4; these redistricting techniques combine with the creation of four (4) majority AAVAP wards and not a single white voting age population ward in order to dilute African American voting strength citywide and deny the right to vote on account of race under the Fourteenth Amendment, the Fifteenth Amendment and Section 2 of the Voting Rights Act. Moreover, past and current CMBOC ward plans did not and presently do not configure or create a majority white voting age ward, even though a majority white voting age population ward can easily be drawn by combining the white population in wards 1 and 2 into a single ward. Under the 2010 census data, CM total population of 17,966 divided by 5 equals 3,593 (an ideal commissioner ward population). The one person one vote principle of the equal protection clause of the Fourteenth

25

Amendment requires that each CMBOC ward has close to 3,593 people. The white and other ethnic origin population in CM 17,966 minus 14184 equals 3,782 and is sufficiently geographically compact to configure a majority white voting age ward. The past and current CMBOC plans intentionally and purposefully did not configure or create a majority white voting age population commissioner ward as a redistricting technique to dilute African American voting strength in CM. To configure all four (4) CMBOC wards with an AAVAP majority is well recognized and documented minority vote dilution technique in the social science literature and judicial cases interpreting and construing the Voting rights Act of 1965.

72. State election laws and local statutes, ordinances, and regulations applicable to elections for board of commissioner members and municipal party executive committee members in CM provide that a majority vote is required to win party nomination or special elections.

73. African American citizens in CM have long suffered from and presently continue to suffer from the results and effects of invidious discrimination and treatment in education, employment, income, health, living conditions, and other related areas.

74. CM has been and presently unresponsive to the particular needs, interests and concerns of the African

26

American community, including racially fair reapportionment of the four (4) CMBOC wards.

75. From 1985 to the present, only two (2) African American citizens have served concurrently on the CMBOC and African American citizens have been denied the opportunity to elect candidates of their choice the CMBOC as a result of and due to well recognized minority vote dilution techniques in redistricting known as cracking (fragmentation) in wards 1 and 2 and packing (overconcentration) of African American in wards 3 and 4 to dilute the overall 78.9% total population and the creation of all AAVAP wards which fail to provide African American voters a realistic ability to elect a commissioner in wards 1 and 2.

76. By virtue of the foregoing, the August 13, 2012 CMBOC ward plan based upon 2010 census data has caused and is causing immediate and irreparable harm and injury to plaintiffs and members of the African American race by denying them an equal opportunity to participate in the political process and to elect candidates of their choice to the CMBOC. Plaintiffs have no plain or adequate remedy at law. Unless restrained and enjoined by the Court, defendant will continue to deny plaintiffs and those similarly situated their rights.

A. First Cause of Action: Section 2 of the
Voting Rights Act of 1965

27

77. The August 13, 2012 CMBOC ward plan used to elect commissioners and municipal party executive committee members results in a denial or abridgment of the rights of plaintiffs and those similarly situated to vote and as a result, African American voters have less opportunity than White voters to participate in the political process and to elect candidates of their choice to the CMBOC in violation of the rights of plaintiffs and those similarly situated secured by Section 2 of the Voting Rights Act of 1965, 42 U.S.C.A. Section 1973 (West. Supp. 1993).

      B.    Second Cause of Action: Official Racial Intentional And Purposeful Discrimination Under The Equal Protection Clause Of The Fourteenth Amendments

78. The allegations of paragraphs 1-77 are realleged and re-adopted herein.

79. The sequence of events leading to the adoption of the ward plan demonstrate that race predominated in the design, configuration and adoption of the August 13, 2012 four (4) ward plan used to elect commissioners and is based on a racially discriminatory purpose of diluting, minimizing, and cancelling out African American voting strength in violation of the rights of plaintiffs and those similarly situated secured by the equal protection clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. Section 1983.

C.    Third Cause of Action: The Intentional
      And Purposeful Denial Of The Right To
      Vote On Account Of Race Or Color
      Provisions Of The Fifteenth Amendment

80. The allegations of paragraphs 1-79 are realleged and are readopted herein.

81. The CMBOC ward plan adopted on August 13, 2012 used to elect commissioners and municipal party executive committee members is based on a racially discriminatory intention and purpose of diluting, minimizing, and cancelling out African American voting strength "on account of race or color" in violation of the plaintiffs' rights and those similarly situated secured by the right to vote in the Fifteenth Amendment to the United States Constitution and 42 U.S.C. Section 1983.

D.    CM Has No Legal Authority Under
      Mississippi Law To Operate With Four
      (4) Wards

82. The allegations of paragraphs 1-81 are realleged and are readopted herein.

83. CM's use of four (4) wards is not authorized by state law and violates the provisions of Miss. Code Ann. Section 21-5-3 (Rev. 1974). CM's total population does not exceed 100,000.

E.    Declaratory Judgment As To The
      Interpretation And Construction Of

29

Miss. Code Ann. 21-5-11 (Rev. 1974)

84. The allegations of paragraphs 1-83 are realleged and readopted herein.

85. In CM, contrary to the provisions of Section 21-5-11, the Mayor supervises all department heads, even though Section 21-5-11 states "[t]he <u>council</u> <u>shall</u> by majority vote, designate one member of the council to be superintendent of each department of the municipal government, and <u>shall</u> define his powers and duties as such superintendent."

86. The Mayor and CMBOC's actions and conduct violate state law and declaratory judgment should be entered.

## V. <u>Relief</u>

WHEREFORE, plaintiffs pray that this Court set this matter down for an expedited and speedy hearing, and upon which hearing:

(a) Declare the August 13, 2012 CMBOC four (4) ward plan impermissibly dilutes, cancels out and minimize African American voting strength and denies African American voters an equal opportunity to elect candidates of their choice as commissioners and municipal party executive committee members and to participate in the electoral processes under Section 2 of the Voting Rights Act of 1965, as amended;

30

(b) Declare the facts and circumstances demonstrate that race predominated in the design, configuration and adoption of the  August 13, 2012 CMBOC four (4) ward plan and violates the equal protection clause of the Fourteenth Amendment of the United States Constitution;

(c) Declare the facts and circumstances demonstrate that race predominated in the design, configuration and adoption of the August 13, 2012 CMBOC ward plan based on 2010 census data violates the Fifteenth Amendment of the United States Constitution;

(d) Declare that CM has no authority under state law to operate with four (4) wards under Miss. Code Ann. Section 23-5-1 (Rev. 1974);

(e) Declare that the Mayor's actions and conduct as the superintendent of city department violate the provisions of Section 21-5-1 (Rev. 1974);

(f) Enjoin the use of the August 13, 2012 CMBOC four (4) ward plan to conduct municipal primary and general elections in May and June 2017;

(g) Implement a court-ordered plan or plaintiffs' proposed four (4) ward plan to conduct the 2017 municipal primary and general elections in Clarksdale, Mississippi;

31

(h) Grant plaintiffs their costs of Court necessary to this litigation and reasonable attorney's fees as provided by 42 U.S.C. Sections 1973 1(e) and 1988; and

(i) Grant plaintiffs such other relief as may be just and equitable.

SO COMPLAINED, this the 24th day of April, 2015.

Respectfully Submitted,

DR. MARY MOTON, Plaintiff

By:_s/ Ellis Turnage_
  ELLIS TURNAGE, Attorney for
  Plaintiff

OF COUNSEL:

ELLIS TURNAGE, MSB #8131
TURNAGE LAW OFFICE
108 North Pearman Avenue
Post Office Box 216
Cleveland, Mississippi 38732-0216
Tel: (601) 843-2811
Fax: (601) 843-6133
eturnage@etlawms.com